IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 17, 2016

**STATE OF TENNESSEE v. ARTERIOUS NORTH**

**Appeal from the Criminal Court for Knox County**
**No. 101406C      Steven Sword, Judge**

_____

**No. E2015-00957-CCA-R3-CD – Filed October 26, 2016**

_____

A Knox County jury convicted the Defendant, Arterious North, of four counts of attempted voluntary manslaughter and four counts of employing a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant to twenty-two years of confinement. On appeal, the Defendant contends that the trial court erred when it denied his motion to sever his case from the cases of his co-defendants and that the evidence is insufficient to sustain his convictions. After review, we reverse the trial court's judgments of conviction and dismiss the charges for the attempted voluntary manslaughter of L.P. and for employing a firearm during the commission of the attempted voluntary manslaughter of L.P. We affirm the trial court's judgments in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part; Reversed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Thomas G. Slaughter, Knoxville, Tennessee, for the appellant, Arterious North.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Counsel; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a shooting that occurred near Austin-East High School on September 7, 2012. For this shooting, a Knox County grand jury indicted the Defendant

and three co-defendants for four counts each of attempted first-degree murder and four counts of employing a firearm during the commission of a dangerous felony.

## A. Pretrial Motion

The morning of trial, the Defendant filed a motion to sever his case from the cases of his three co-defendants. His attorney informed the trial court that a joint trial would "be a mess" because two of the co-defendants were hostile to the other two co-defendants. The Defendant's attorney said that one of the co-defendants had shot at the Defendant's mother's house. Further, one of the co-defendants had been convicted of attempted first-degree murder for shooting into the Defendant's friend's house two weeks before the shooting in this case. The Defendant said that he wanted to present the theory of defense that, during the shooting in this case, his state of mind was one of fear based upon a past shooting and in defense of a third person, whom he believed was being robbed. Counsel for one of the Defendant's co-defendants stated that he sought to exclude information about this other recent shooting. That co-defendant also sought to exclude evidence of a shooting thirty minutes before the shooting in this case that allegedly involved some of the co-defendants.

Defendant's counsel explained to the trial judge that two of the co-defendants were charged with robbing two minor victims, who were standing near the high school that they attended, but that the Defendant was not charged with this crime. He, instead, was charged because he fired his weapon in what he believed was the defense of these two students, and a shoot-out ensued. All four co-defendants were charged with the attempted murder of the two students, one of whom was shot. Two of the co-defendants were charged with the attempted murder of the other two co-defendants and vice versa, making all four defendants both victims and defendants for different counts in the indictment. This situation, he posited, was confusing to present at a single trial. He did not want to appear as if he was working with co-defendant's counsel because the Defendant was attempting to blame the cause of the shooting on two of his co-defendants.

The trial court asked which witnesses the Defendant's attorney intended to call that would be prevented from testifying if the trial was jointly tried. The Defendant's attorney indicated he would call co-defendant Harbison's mother, whose house was shot by the other two co-defendants. The trial court told the Defendant's attorney to call her as a witness. The Defendant's attorney indicated that co-defendant Harbison's mother was scared and did not want to testify and that he had not prepared her to testify. The trial court then indicated that it had heard this motion once before and that there was no proof presented at the separate hearing on that previous motion that the co-defendants

2

had antagonistic defenses. The trial court said, however, that any evidence supporting a self-defense argument might be relevant to the issue of severance.

After conferring with the Defendant, the Defendant's attorney informed the trial court that he was not going to call Ms. Harbison to testify. The trial court ruled that none of the co-defendants' counsel could discuss any prior bad acts at trial without first requesting a hearing outside the presence of the jury on the prior bad act. After a recess the trial court found:

> [S]ince there hasn't been any evidence really presented . . . at this point that the Court can rely on in saying that it'd be admissible and would mandate a severance for a fair determination, the Court's going to deny the motion now. However, it's possible during trial that things can develop in such a way in order to promote a fair determination and for the trier of fact to be able to distinguish the evidence and apply the law intelligently, we may have to sever it, but we're going to see how it goes.

### B. Trial

At the Defendant's trial, the parties presented the following evidence: Michael Allen Mays, a 911 operator and record keeper, testified that he received a call about a shooting from 2800 Martin Luther King, Jr. Avenue, on September 7, 2012, at 4:31 p.m.

Linda Detienne testified that she worked as a bus operator for Knoxville Area Transit, and she was working at the time of this shooting. She recalled that she passed by Austin-East High School ("Austin-East") at around 4:30 p.m. on September 7 travelling twenty miles an hour in accordance with the school zone speed limit. She recalled that there were a large number of children in the area because school had recently been dismissed. Ms. Detienne recounted that there was a cream-colored car in front of her bus and a gold car in front of the cream-colored car. She recalled that, shortly before the cars and bus got to the end of the Austin-East school zone, the gold car stopped while the cars in front of it went on. A young, "light-colored-skin" black man, who was wearing khaki pants, a t-shirt, hat, and sneakers, got out of the gold car and went over to two boys who were on the sidewalk. The man said something to the boys and, in response, they pulled their pockets inside out. Ms. Detienne became concerned that the man was robbing the boys. The man returned to the gold car, retrieved a gun, and fired the weapon.

Ms. Detienne said that she immediately called her central base to tell them that there had been a shooting and that she needed emergency responders. Ms. Detienne said that she then told her passengers to get under their seats. The man walked between the cream-colored and gold-colored cars and then to the sidewalk and around a brick house.

3

The gold car then started moving and traveled to the next intersection where it turned left. The man continued to fire his weapon as he left the scene. Ms. Detienne's dispatch told her to protect the passengers on her bus by continuing on her route, so she could not render aid to the victims of the shooting. Ms. Detienne said she went to the hospital to see one of the victims and was relieved to learn that he had survived and was recovering.

During cross-examination, Ms. Detienne said that she did not see another car involved in this incident and that the driver of the gold car drove away as soon as the shooting began. She said she saw other people, some of them girls, standing near the victims. Ms. Detienne said that the man who exited the car and fired the gun had "[d]readlocks." She said that, when the man fired the weapon, the boy on the right immediately went to the ground, but "[a] lot of shots" were fired after that point.

Malaika Gutherie testified that she was a dance teacher at Austin-East, which is a performing arts school, and was also a teacher at Vine Middle School, where her daughter attended. On September 7, 2012, Ms. Gutherie was leaving Austin-East at around 4:30 p.m. With her were her daughter and her daughter's friend, who both attended Vine Middle School. Ms. Gutherie recalled that she pulled onto Martin Luther King, Jr. Avenue and, shortly thereafter, the gold car in front of her stopped in the middle of the street. Ms. Gutherie recalled that a KAT bus was behind her.

Ms. Gutherie said that she saw a man, wearing khaki pants and a white t-shirt and having dreadlocks, get out of the gold car and approach two male students who were on the sidewalk. The man left his car door open as he approached the students, and Ms. Gutherie became concerned that a confrontation was beginning. She could tell that the man who exited the gold car was acting "aggressive[ly]" and that it was a confrontational interaction. The students had their hands up and then both began pulling their pockets inside out. Ms. Gutherie believed that the students were being robbed. She then saw the man turn back towards his car, and she heard gunfire. She recalled "several" shots. Ms. Gutherie saw a man run away from the scene. She said the man firing the weapon went back toward the car, but she then lowered her head and the heads of the two girls in the car, so she did not see anything further.

Ms. Gutherie testified that, after the car in front of her drove away, she heard one of the students yelling that he had been shot. Ms. Gutherie pulled toward the two students, told the girls to remain in the car, and called 911. Ms. Gutherie enlisted the aid of another man, and they went to help the student that had been shot.

During cross-examination, Ms. Gutherie testified the shooter did not return to his car before shooting. Ms. Gutherie agreed that she never saw a gun or someone shooting, but that she heard a lot of gunshots. She said she was unsure when the gold car pulled

4

away from the scene after the shooting. She said that the shooter ran back to the car and got into the car. During further cross-examination, she said that the shooter did not have a gun in his hands when he first approached the students. Further, she reiterated she did not see a gun.

A.G.,[1] Ms. Gutherie's daughter, testified that she was attending Vine Middle School at the time of this shooting. She recalled the events surrounding the shooting, confirming much of Ms. Gutherie's testimony. A.G. added that she believed there were three people in the gold car from which the shooter exited. She said that a third man was sitting in the backseat on the driver's side. A.G. also said that, before the shooting started, another car, dark in color, drove past them in the opposite direction. Someone from inside the dark-colored car started shooting first. The people in the gold-colored car in front of them started shooting at the dark-colored car.

During cross-examination, A.G. testified that she never saw the man, who got out of the car in front of her, in possession of a gun. She said she was unsure when the students were hit with gunfire. She reaffirmed that the people in the dark-colored car started shooting first and that the man from the gold car pulled out a gun and fired back. After the shooting, both cars drove away. A.G. said that her mother told her to "get down" after shots came from the dark-colored car.

S.W. testified that one of the victims standing on the sidewalk, L.P., was her cousin. She knew the other victim, Q.T., as L.P.'s friend. She said that at the time of this shooting she attended Austin-East High School. The day of the shooting she left the school and saw L.P. down the hill. She started walking toward him to go to his mother's house, which was her routine on school days. S.W. recalled sitting with a group of freshman on a wall, and she said the group was talking and laughing. A car drove past them a few times playing loud music. All four occupants of the car appeared to be dancing to the music. The second time that the car passed, she saw the occupants displaying "Crip" gang hand signs. S.W. said that L.P. and Q.T. "were doing hand signals back." S.W. said that she recognized the passenger who was seated in the right rear passenger's seat as M.W., whom she said was well-known around Knoxville.

S.W. said that the third time the car rode past it stopped in front of the group. A man exited the front passenger side of the car and approached L.P. and Q.T. The man patted his own pockets and asked the two victims if they had "something." The two victims said that they did not have anything, and the man pulled out a gun. The man stepped back, identified himself, and stated he was with a gang from the "west side."

---

[1] In order to protect the privacy of the minors involved, we will refer to them by their initials only.

S.W. did not recall the name that the man gave or his gang affiliation. She said that, after identifying himself, the man started shooting. S.W. said that another man exited the left rear passenger seat and that he also began shooting. She ran to the school to tell someone that L.P. had been shot while Q.T. stayed behind to help L.P.

During cross-examination, S.W. said that it appeared as if the men in the car were "showing off" as they were driving by before the shooting. She agreed it was not out of the ordinary for groups of men to display hand signs to each other. She agreed that she did not recognize the first man who got out of the vehicle. S.W. said that the driver of the car never got out and that she did not see another car involved in this shooting.

During further cross-examination, S.W. testified that it initially appeared that L.P. knew the men in the car, but when the man from the car approached him it was clear that he did not know him.

Q.T. testified about the events surrounding L.P.'s shooting. He said that he went to school that day and, after school, he and L.P. were sitting on a wall talking with some friends. A gold car drove past them. Q.T. believed that the car contained his "brother," so he flashed a hand signal representing the Blood Gang. The car returned, the front passenger got out of the car, and said "which one of y'all threw a Blood?" Q.T., who noted the handle of a gun protruding from the waistband of the man's pants, said that they replied, "We don't bang." The man told them to empty their pockets, and he still had not displayed his weapon. Q.T. said that by the time he emptied his pockets a man from another vehicle started shooting at him and L.P. Q.T. said that he and L.P. attempted to run away, but L.P. fell, saying that he had been shot. Q.T. noted that the man who had asked them to empty his pockets took out his gun and began firing it back in the direction from which the gunshots were coming. He then ran across the street and through someone's yard. The gold car drove away. Q.T. said that he stayed with L.P. until an ambulance came.

During cross-examination, Q.T. clarified that the man who approached them and asked them to empty their pockets was not the man who shot them. The shots came from another direction. Q.T. said he thought that Demetrius, his brother, was in the gold car when it first drove past. Q.T. recalled that the man who asked him to empty his pockets never asked him to empty his backpack, which was on his back. Q.T. said that there were two men in the dark-colored car from which the shooter emerged. That car was "a little bit down" in front of the gold car. The shooter got out and began firing.

L.P. testified that this shooting occurred on a Friday during the day before he and his friends planned to attend a high school sporting event. He said that, after school, he went to meet Q.T. and his other friends near the school. As they were standing near a

6

wall a short distance from the school, a gold car drove past them several times, and he noted that it was a rental car. In the car, L.P. saw M.W. sitting in the rear passenger seat. The car drove past again and stopped. A man, who L.P. later identified as co-defendant Brown, emerged from the gold car with a gun in his waistband, said his name was "Qweezy," and asked which person threw "up that Blood [gang sign]." The group said that none of them had displayed a Blood sign, and the man told them to empty their pockets.

L.P. said that, at that point, another car, which he described as "blackish" with tinted windows, pulled up. The occupants of the car began shooting "[t]hrough the windows." Co-defendant Brown left the scene, shooting in the direction of the high school.

L.P. said that he was shot in the arm and in the stomach. One of the bullets hit his spine, and he had to learn how to walk again, which took a couple of months.

During cross-examination, L.P. testified that the men in the gold car were laughing before co-defendant Brown emerged from the car. He reiterated that co-defendant Brown did not take his weapon from his waistband and that the only time he saw co-defendant Brown shoot was when he fired toward the high school. L.P. said that co-defendant Brown asked Q.T. to turn out his pockets but did not make this request to L.P. Co-defendant Brown neither asked Q.T. for money nor took anything during the encounter. L.P. said that he knew co-defendant Harbison and that they were on friendly terms. He said that he knew of the Defendant and did not have any problems with him.

Brian Dalton, a Knoxville Police Department officer, testified that he responded to this shooting scene. He said that he photographed the scene, and he showed and explained those photographs to the jury. Among other things, he found bullet fragments and shell casings from two different caliber weapons: a .380 and a .45.

Rachel Warren, an evidence technician for the Knoxville Police Department, testified that she went to the hospital to photograph the shooting victim, L.P. When she arrived, she saw that L.P. had tubing all over the front part of his body. She noted that L.P. had wounds to his right arm and right abdomen. Ms. Warren took photographs depicting L.P.'s face and wounds, and she showed those pictures to the jury. She also took possession of the clothing he wore at the time of the shooting.

Russell Whitefield, a Knoxville City Police Department employee in the forensic unit, testified that he participated in this investigation. He said that he played only a small role, which included going to the impound lot on September 14, 2012, and photographing a brown, four door, 2012 Chevrolet Malibu that police had impounded.

7

The vehicle had a North Carolina license plate, and the right window was broken out. The left, rear passenger door had a black plastic trash bag duct taped over it. There were two holes in the driver's door, and they appeared to be bullet holes. Mr. Whitefield said that it appeared that the vehicle had been hit by four different bullets. Mr. Whitefield found a spent bullet under the driver's floor mat and one on the rear passenger seat. Mr. Whitefield found Hertz rental documentation in the vehicle, which he also photographed.

During cross-examination, Mr. Whitefield agreed that the bullet-hole damage likely occurred after the car was rented. Mr. Whitefield said that it would have been difficult for someone shooting out of a car to shoot at the trajectory at which these bullet holes entered the Malibu.

Lisa Knight, employed by the Tennessee Department of Safety and Homeland Security in the handgun office, testified that none of the co-defendants had applied for or received a handgun permit. She said it is against the law to carry a loaded handgun in public with no handgun carry permit.

Tiffany Hamlin, assigned to the forensic unit of the Knoxville Police Department, testified that she helped process the dark-colored Chevrolet Cobalt involved in this case. She said that she saw several "defects" to the car, some of which appeared to have been caused by bullets. She also found a fired bullet on the driver's side floorboard. She found a shell casing behind the passenger seat. Ms. Hamlin testified that two wallets were found inside the car, both of which contained identification: one belonging to co-defendant Harbison and the other belonging to Montieve King.

During cross-examination, Ms. Hamlin testified that she did not know when the Cobalt arrived at the impound lot. She said that she noticed "defects" to both sides of the car, as well as to the front. Some of the defects were dents and not holes. She clarified that she did not find the wallets in the car but, instead, an investigator that was also looking through the car found them and asked her to photograph them.

Edward Johnson, an officer with the Knoxville Police Department, testified that he retrieved from the hospital the bullet that doctors removed from L.P.

Patricia M. Resig with the Knoxville Police Department testified that she was a firearms examiner. She examined the bullets, bullet fragments, and shell casings gathered by law enforcement at the scene of this shooting. She identified two casings as having been fired from a .380 weapon. Others were fired from a .45-auto. Ms. Resig could not tell from which weapons the bullet fragments came. Ms. Resig testified that she examined the bullet evidence submitted by Mr. Whitefield from the Chevrolet Malibu. She said that one of the bullets found was fired from a .45-caliber weapon and

8

the bullet jacket found came from a .38, .357, or 9-millimeter weapon. Ms. Resig said that the bullet retrieved from L.P. was fired from a .45 weapon and that it displayed rifling characteristics consistent with the .45 spent bullet retrieved from the Malibu. Ms. Resig said that she also examined a 9 millimeter Luger cartridge casing. Ms. Resig determined that there were at least three different weapons fired at the scene.

During cross-examination, Ms. Resig agreed that she had no way to know if these bullets, fragments, and casings were all fired at the same time or on the same day.

Brandon Wardlaw, an investigator with the Knoxville Police Department, testified that he was assigned to investigate this shooting. As part of his investigation, he assisted in interviewing co-defendant Brown. He said that co-defendant Brown was, initially, not forthcoming but after officers explained that they had spoken with witnesses placing co-defendant Brown at the scene, co-defendant Brown asked the officers about the difference between robbery and aggravated robbery. Co-defendant Brown then denied having a weapon. Investigator Wardlaw identified a video of this interview, and the State played it for the jury.

The video showed Investigator Jinks and Investigator Wardlaw interviewing co-defendant Brown. Co-defendant Brown denied robbing Q.T. and L.P. He said that he initially stopped his car because the students were throwing gang signs at him. He approached them and asked them to turn out their pockets to ensure that they were not armed. Co-defendant Brown said that he then heard gunshots, he got down, and his friends left him. After the gunshots he heard witnesses say "somebody got hit," and he looked and saw that it was not him who had been shot, and then he ran away. Co-defendant Brown identified the cars in which the shooters were riding as a Chevrolet Cobalt. Co-defendant Brown maintained that he was unarmed when he approached the students and that he never robbed them.

During cross-examination, Investigator Wardlaw testified that the slang term "he ain't holding" meant that someone was unarmed. The investigator said that, at the beginning of the interview, co-defendant Brown did not tell him the truth about the events surrounding the shooting. Further, co-defendant Brown maintained throughout the interview that he did not have a weapon during these events. Co-defendant Brown said that his friends left him at the scene and that he had ridden a bike to get home. He explained that he was not from the east side of town but, rather, his "stomping grounds" were the west side of Knoxville.

Chas Terry, another investigator with the Knoxville Police Department, testified that he assisted in this investigation and participated in co-defendant Campbell's interview. During this interview, co-defendant Campbell said that he had traveled to

9

Austin-East from "the Ville." Co-defendant Campbell said that he was driving, and he stopped the car. Shortly thereafter, another car pulled up beside him, and the occupants started shooting. Co-defendant Campbell said that he immediately ducked, and he heard a "bunch" more gunshots. He said that he then blacked out and woke up when he was at a stop sign.

During cross-examination, Investigator Terry testified that it was a ten or fifteen-minute drive from the scene of the shooting to where co-defendant Campbell was apprehended. The investigator further agreed that co-defendant Campbell never said he had a gun or fired a gun during the shooting.

Amy Jinks, a Knoxville Police Department investigator, testified that she responded to the shooting call in this case. She said that, after speaking with other officers, she went to the Safety Building to interview any witnesses, after which she went to the University of Tennessee Hospital to interview L.P. Investigator Jinks said that she interviewed co-defendant Brown and that she informed him of his *Miranda* rights, and he waived those rights. After this interview, Investigator Jinks obtained a search warrant and searched the Chevrolet Malibu that had been impounded. She then interviewed L.P. again, and she recorded that interview. During that interview, L.P. identified co-defendant Brown and M.W. from two different photographic line-ups. M.W. was a juvenile at the time of this identification.

Investigator Jinks said that she interviewed co-defendant Campbell, but he requested that she leave, stating that he was more comfortable with Investigator Terry. She, however, monitored the interview using the recording equipment. Investigator Jinks said that, later, she obtained a search warrant for the Chevrolet Cobalt, and she executed that search warrant. She said that she found the identification of co-defendant Harbison and Mr. King in the vehicle. She also found a cell phone.

Investigator Jinks testified that she interviewed co-defendant Harbison after she informed him of his *Miranda* rights. She said that co-defendant Harbison was not initially forthcoming, but he eventually admitted to being present at the scene of the shooting. Investigator Jinks said that co-defendant Harbison admitted that he had fired his weapon during the shooting, and he told the investigator that he had later disposed of the gun.

The State played portions of the recorded interview for the jury. In the video, co-defendant Harbison testified that his car stopped at the scene where co-defendant Brown was speaking with the students because there was a school bus with its stop sign illuminated. When Investigator Jinks asked co-defendant Harbison if he still had the weapon he used that day he said, "I don't got it."

10

Investigator Jinks testified that she interviewed the Defendant. During the interview, which the State played for the jury, the Defendant admitted that he fired a .357 on the day L.P. was shot. He identified the guns that other people were carrying at the time, and he told her what type of gun he believed that co-defendant Harbison had, saying that it was a 9-millimeter handgun. The Defendant said that he believed that the two men in the back had a Glock and a Hi-Point, but he did not know which man carried which weapon.

Investigator Jinks identified a diagram that helped her to describe which defendants were riding in which vehicles. In the gold-colored car, were co-defendant Campbell, who was driving, co-defendant Brown, and M.W. In the dark car, which co-defendant Harbison was driving, the passengers were the Defendant, who sat in the front passenger's seat, and Mr. King and Paul Issacs, who both sat in the back.

During cross-examination, Investigator Jinks said that, at the time she learned that one of the suspects had a Hi-Point firearm, she may have been unaware that L.P. had been shot by a .45, consistent with a Hi-Point semiautomatic weapon. Investigator Jinks agreed that there were several people at the scene after this shooting occurred, and it would have been better if they had not walked in the area where evidence was found.

During redirect-examination, Investigator Jinks said that after she interviewed the Defendant and learned that there were two other men in the backseat of the car, she attempted to talk to co-defendant Harbison again. He refused to speak with her a second time. She did, however, find Mr. King and interview him. She said that she had no proof, other than the Defendant's statement, that Mr. King was a shooter.

Co-defendant Harbison testified that, at the time of this shooting, he carried a 9-millimeter weapon out of fear and for his own protection. He said that he admitted this fact to Investigator Jinks. Co-defendant Harbison explained that his mother's house, his best friend's house, and his car had all been "shot up" in the two weeks preceding this shooting. He said that, on the day of the shooting, he was driving toward the school. He stopped because he saw a school bus sign illuminated. He looked over toward another stopped car and saw someone robbing L.P., who went to school with co-defendant Harbison's sister, and Q.T., whom he knew because co-defendant Harbison had helped teach Q.T. to play the drums.

Co-defendant Harbison said that he saw the robber step back to the car from which he came. The robber then shot his weapon, and co-defendant Harbison returned fire in an attempt to protect L.P., who appeared to be in danger. Co-defendant Harbison said that he was not attempting to kill anyone, and he was not aiming his weapon in an attempt to

11

kill anyone. Co-defendant Harbison noted that the three men in the vehicle from which the robber came were only three feet from him and that, if he had wanted to kill them, he could have done so. Co-defendant Harbison testified that, when the men started shooting at his car, he drove away.

During cross-examination, co-defendant Harbison testified that a man named Cuben Lagrone was convicted for shooting his mother's house. He said that, at the time, he did not know who had shot his mother's house, so he procured a weapon from someone on the "street." Co-defendant Harbison agreed that, before L.P.'s shooting, there had been an incident between co-defendant Harbison and co-defendants Campbell and Brown. Co-defendant Harbison said that the man who shot his mother's house, Mr. Lagrone, associated himself with co-defendants Campbell and Brown. Co-defendant Harbison agreed that on the day of this shooting he did not like co-defendants Campbell and Brown.

Co-defendant Harbison testified that he stopped his car because there was a school bus with its stop sign out. He believed that there were school children on the bus. He also believed that co-defendant Brown was robbing the two school-age boys. Co-defendant Harbison said that, while he watched, it appeared that co-defendant Brown was backing up toward the car from which he exited while robbing the two boys. He said that he then heard a shot. Co-defendant Harbison said that he retrieved his weapon from underneath his seat and he discharged the weapon twice into the air to stop the robbery. He agreed that, at the time he fired his weapon, he recognized co-defendant Brown. Co-defendant Harbison said that the Defendant also fired his gun, but he was not sure in which direction the Defendant aimed. Co-defendant Harbison said that the two men in the backseat returned gunfire. He said that, at that point, he pulled away and parked at a friend's house nearby. He said he did not call the police because he was sure that they had already been notified. Co-defendant Harbison said that everyone in the car went their separate ways at that point. Co-defendant Harbison said that his car had been "shot up" approximately two weeks before this incident.

Co-defendant Brown testified that before September 7, 2012, he did not know co-defendant Campbell to own or possess a gun. He recalled that on that day, at around 4:25 p.m., he was riding in the front passenger seat of a car that co-defendant Campbell was driving. There were two other men, whom he knew as "NY" and "D," who were riding in the backseat. He said that someone whom they did not know and who was on the sidewalk flagged down their car by flashing a "b" and then a hand signal for getting attention. He explained that, "You got to know somebody to do that. You don't just do that to anybody or strangers, period."

Co-defendant Brown said that, because of this, co-defendant Campbell stopped the car and co-defendant Brown got out. He said that he approached the two male students, one of whom gave the hand signal, but co-defendant Brown did not get "too close" to them. Co-defendant Brown maintained that he was unarmed during this encounter. He asked the student his name, and the student gave him a nickname. Co-defendant Brown offered the student his own name and told him where he was from. The two realized that they did not know each other.

Co-defendant Brown testified that, after he realized that the student was not who he thought, he went into "safety mode, awareness mode." He stated that he was "really worried." He told the two boys to raise their shirts up and empty their pockets, so he could see if they had any weapons. He said that he walked back two or three steps. When he turned around, he heard a gunshot, and he fell down between his car and the curb. Co-defendant Brown said that he did not have a gun and never discharged a gun.

Co-defendant Brown testified that a bullet grazed him. While he was on the ground where he had fallen, the car in which he came left him, so he "took off running." He found a bike, took it, and rode it back to his side of town. Co-defendant Brown said that he had "no involvement" in the shooting of co-defendant Harbison's mother's house.

During cross-examination, co-defendant Brown agreed that he had carried a weapon before this incident, specifically on April 15, 2012. He did not recall what type of handgun he possessed. He also agreed that, on August 13, 2012, he possessed a gun. He said that Cuben Lagrone was his "little cousin" and that he later learned that the man whom he knew as "NY" was M.W.

Co-defendant Brown said that, on the day of this shooting, he, co-defendant Campbell, "NY", and "D" intended to celebrate co-defendant Campbell's birthday together by taking a trip to Gatlinburg. The men arranged to rent a car from Hertz, and co-defendant Campbell's uncle took them to the car rental at 1:49 p.m., shortly before this shooting. He agreed that, when they left Mechanicsville where they lived, they did not have to go to the east side of Knoxville to get to Gatlinburg. They, however, elected to do so anyway to get clothing and other items to prepare for their trip.

Co-defendant Brown said that, before he left the area in which he lived, he went to the home of his child's mother, which was near his own home. He took a shower and retrieved some clothing. Co-defendant Brown said that the men then went to co-defendant Campbell's house. The men went to a Laundromat, and then co-defendant Campbell walked to his house, leaving the other men waiting at the Laundromat. When co-defendant Campbell returned, he had a bag of clothing. The two men then went to an apartment complex to pick up M.W., whom they knew as "NY." M.W. did not have the

clothing that he needed, so they drove to the east side of town to M.W.'s girlfriend's house to retrieve clothing.

After retrieving the clothing, the men, riding in the gold car with co-defendant Campbell driving, traveled by Austin-East High School with their music turned up loudly. One of the students on the side of the road appeared as if he was trying to flag them down, so they circled their car around again. Co-defendant Brown said that he got out of the car to see who the students were, but then he realized that he did not know them, and he became concerned for his safety.

Co-defendant Brown agreed that he told Investigator Jinks that she should find co-defendant Harbison because he would "tell you everything, you know. That's what he does. He talks to the police." He agreed this was based upon an experience that he had with co-defendant Harbison when they were juveniles. He said that he did not know the Defendant.

Co-defendant Brown agreed that he phoned the mother of his child from jail and asked her to get a "yak back" from "NY." He did not agree that a "yak" is "necessarily" a slang term for a gun.

During further cross-examination, co-defendant Brown testified that the witnesses were not telling the truth when they said that he had a gun.

In rebuttal, the State offered the testimony of Investigator Wardlaw, who testified that he investigated Mr. Lagrone for shooting co-defendant Harbison's mother's house. As part of his investigation, he retrieved a cell phone. On the cell phone was a video from August 13, 2012, that showed Mr. Lagrone driving a car and co-defendant Brown in the passenger seat. Both men possessed firearms, and, as they passed two or three police cars on the side of the road, they started saying, "There go the boys. Get ready . . . ." At this time, Mr. Lagrone is seen holding a Smith & Wesson handgun, and co-defendant Brown was holding a firearm with an extended magazine.

Based upon this evidence the jury convicted the Defendant of four counts of attempted voluntary manslaughter and four counts of employing a firearm during the commission of a dangerous felony.

### C. Sentencing

The trial court summarized the convictions as follows:

In count No. 11 of attempted voluntary manslaughter of [L.P.], that is a class D felony; and count No. 12, attempted voluntary manslaughter of [co-defendant] Brown, also a class D felony; and attempted voluntary manslaughter of [co-defendant] Campbell, a D felony; attempted voluntary manslaughter of [M.W.], also a D felony; and count No. 15, employing a firearm during the commission of a dangerous felony, being the attempted voluntary manslaughter of [L.P.] as charged in count 11. That is a class C felony, as I said, but the statute mandates a minimum sentence of six years at 100 percent consecutive to the underlying dangerous felony.

Count 16, also employing a firearm during the commission of the attempted voluntary manslaughter of [co-defendant] Brown. Again, the statute mandates a minimum sentence of six years consecutive to count No. 12; and count No. 17, employing a firearm during the commission of the attempted voluntary manslaughter of [co-defendant] Campbell, also six-year sentence minimum, consecutive to . . . count No. 13. And, finally, count No. 18, employing a firearm during the commission of the attempted voluntary manslaughter of . . . [M.W.], also a mandatory minimum sentence of six years consecutive to count No. 14.

Investigator Jinks then testified that, during her interview with the Defendant, he told her that the men had traveled to the east side of Knoxville to look for Campbell, Brown and M.W, because they were known to hang out there on Fridays and Saturdays. He said that they came across the men by Austin-East that day.

Investigator Wardlaw testified that the Defendant told them that he was a member of the "Tree Top Pirus." He identified and submitted five photographs that depicted the Defendant in gang-related clothing, holding a hangun, or displaying a gang sign.

The State asked for enhancement factors based, in part, upon the number of children in the area at the time of the shooting and, in part, because of the Defendant's prior criminal history.

The trial court sentenced the Defendant to twenty-two years of incarceration. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it denied his motion to sever his case from the cases of his co-defendants and that the evidence is insufficient to sustain his convictions.

15

## A. Severance

The Defendant contends that the trial court erred when it denied his motion to sever because his case was tried along with co-defendant Campbell and co-defendant Brown, who were two alleged victims of the crimes for which the Defendant was charged and who were themselves charged with crimes against the Defendant. The Defendant states that, while all four defendants were charged with crimes against L.P., they were each also charged with crimes against each other. The Defendant and co-defendant Harbison were charged with crimes against co-defendant Campbell, co-defendant Brown, and M.W. Co-defendants Campbell and Brown were charged with crimes against the Defendant and co-defendant Harbison. The Defendant says this put the defendants in an adversarial relationship to each other, and it undermined his ability to present a defense. He further contends that the strategy of co-defendants Brown and Harbison, who both testified, differed greatly from his trial strategy.

The State counters that this issue is waived. The State first asserts that the Defendant did not raise this issue pretrial and that the Defendant's oral motion the morning of trial was not timely. The State next contends that, in the Defendant's oral motion, he simply argued that the failure to sever would result in a confusing trial, but he did not present any evidence to support this argument. The State further notes that the Defendant's brief fails to contain any citation to the record, which results in a waiver of this issue. Alternatively, the State contends this issue lacks merit because the offenses for which the defendants were charged were "so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others," citing Tennessee Rule of Criminal Procedure 8(c). The State asserts that proof of each defendant's role was relevant to establish the motives of all the defendants. It further notes that the Defendant used the evidence of the actions of co-defendants Brown and Campbell to argue that he acted in defense of L.P.

The morning of trial, the Defendant asked for his case to be severed from his co-defendants because a joint trial would be a "mess" since two of the co-defendants were adverse to two of the other co-defendants. The Defendant informed the trial court that he wanted to present evidence that co-defendants Brown and Campbell had shot co-defendant Harbison's mother's house and that they wanted to exclude this evidence. The Defendant stated that he wanted to present evidence that his shooting was in defense of L.P. and was based upon fear caused by the shooting of co-defendant Harbison's mother's house. He stated that, if the cases were severed, he would call co-defendant Harbison's mother. After a brief recess, the Defendant confirmed that co-defendant Harbison's mother was unwilling to testify either way. The trial court stated that it was

16

denying the Defendant's motion at that time but that the Defendant could renew the motion based upon the proof presented at trial. The Defendant never renewed his motion.

The first issue we must address is whether Defendant has waived his right to a severance by not timely raising the motion to sever until the morning of trial, by not providing the trial court with an adequate argument to support his motion, and by not citing to the record in his appellate brief. We first note that several matters must be raised prior to trial, including a motion to sever. *See State v. Cameron*, 909 S.W.2d 836, 853 (Tenn. Crim. App. 1995). Failure to present these motions before trial amounts to waiver of the issue. *Id.* (citing *State v. Eldridge*, 749 S.W.2d 756, 757 (Tenn. Crim. App. 1988)). As the State notes,

> When a procedural rule or a statute requires filing before trial, ordinarily this connotes a date previous to that upon which the trial is set to begin. As stated in *State v. Hamilton,* 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981):
>
> > "We agree with the trial court's interpretation of Rule 12(b)(3), T.R.Cr.P. in which he stated 'prior to trial' means some time earlier than 'the day of the trial when the jury is waiting in the hall.'"
>
> *State v. Smith*, Tenn., 701 S.W.2d 216, 217 (1985).

*State v. Stephenson*, 752 S.W.2d 80, 83 (Tenn. 1988). While it is a better practice to file a motion to sever before the morning of trial, we have routinely not treated the issue as waived when a motion to sever is heard and decided by the trial court the morning of trial. We further note that the State proceeded to present a counter to the Defendant's motion and did not argue that it was untimely, thereby waiving its right to assert that the motion was not timely filed. On these bases, we will address this issue on its merits.

We next turn to address whether the Defendant waived this issue for failure to cite to the record in his brief. While the State is correct that the argument section of his brief does not contain citations to the record, the facts section of his brief refers to the section of the record upon which the Defendant relies. *See* Tenn. R. Crim. P. 10(b). We, therefore, do not consider this issue waived on these grounds.

Having concluded that the Defendant has not waived our review of this issue, we turn to address the issue on its merits. The law on a motion for severance includes that "[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial

court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his codefendant." *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'" (quoting *Hunter*, 440 S.W.2d at 6)). "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants . . . if each of the defendants is charged with accountability for each offense included" or "all of the defendants are not charged in each count if the several offenses charged: (A) were part of a common scheme or plan; or (B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c)(1), (3).

If the defendant's motion for severance is based upon a co-defendant's out-of-court statement which "makes reference to the defendant but is not admissible against the defendant," the trial court must first determine if the State plans to offer the statement into evidence at trial. Tenn. R. Crim. P. 14(c)(1). If the State does so intend, it must choose one of the following:

> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;
>
> (B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or
>
> (C) severance of the moving defendant.

*Id.* A defendant may also seek severance on the basis that it is necessary "to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A).

18

The provisions of Rule 14(c)(1)(B) can be at odds with the completeness rule, which provides that, if the State introduces into evidence only a portion of the defendant's confession at trial, the defendant "is normally entitled to prove the whole of what was said in order for the jury to be able to weigh the whole statement" unless the confession "involv[es] a non-testifying co-defendant." *Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996) (citing *Curry v. State*, 397 S.W.2d 179 (Tenn. 1965); *State v. Brett Patterson*, No. 88-245-III (Tenn. Crim. App, Nashville, Dec. 8, 1989), *perm. app. denied* (Tenn. Mar. 5, 1990)). "To hold otherwise would be to render impossible the use of a redacted statement in joint trials involving a *Bruton* situation." *Denton*, 945 S.W.2d at 801. In *Bruton v. United States*, the Supreme Court held that admission of a statement of a non-testifying co-defendant which incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. *Bruton v. United States*, 391 U.S. 123, 126 (1968); *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The Tennessee Supreme Court has determined that a defendant usually requests a severance: (1) because of antagonistic defenses or (2) where one of the defendants has made a confession that the State seeks to introduce. *Dorsey v. State*, 568 S.W.2d 639, 642 (Tenn. 1978). In *Dorsey*, the Tennessee Supreme Court stated, "[T]he rule in *Bruton* does not apply to confessions which [d]o not implicate the non-confessing defendant, nor does it apply to confessions from which 'all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant.'" *Dorsey*, 568 S.W.2d at 642 (quoting ABA Standards Relating to Joinder and Severance § 2.3(a)(ii) (1967)). Similarly, as the Tennessee Supreme Court stated, "[T]he *Bruton* rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the non-confessing co-defendant's Sixth Amendment right of confrontation." *State v. Elliot*, 524 S.W.2d 473, 477 (Tenn. 1975).

The mere fact that there may be more damaging proof against one defendant, as opposed to the other, does not require a severance. *State v. Rosalind Marie Johnson and Donna Yvette McCoy*, No. E1999-02468-CCA-R3-CD, 2000 WL 1278158, at *4 (Tenn. Crim. App., at Knoxville, Sept. 11, 2000) (citing *State v. Meeks,* 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993)), *perm. app. denied* (Tenn. Apr. 9, 2001). Further, "the speculative risk of a spill-over effect" does not justify a conclusion that a joint trial was an abuse of discretion. *Id.* Furthermore,

> [w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se." *State v. Farmer, et al.,* No. 03C01-9206-CR-00196, 1993 Tenn. Crim. App. LEXIS 420, 1993 WL 247907 ([Knoxville,] July 8, 1993) citing *Zafiro v. United States,* 506 U.S. 534, 537-38 (1993). Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these

19

grounds. *Id.* Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. *Id.* "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." *Id.* [(]quoting *United States v. Horton,* 705 F.2d 1414, 1417 (5th Cir.1983)[)].

*State v. Christopher Swift and Marquavious Houston*, No. W2013-00842-CCA-R3CD, 2015 WL 2128782, at *9-10 (Tenn. Crim. App. May 5, 2015) (citing *State v. Ensley,* 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996)), *no Tenn. R. App. P. 11 filed*.

In the case under submission, the Defendant moved for a severance from his co-defendants. The Defendant was not charged with all the counts in the indictment. The following chart lists the counts:

| Count | Defendant | Offense | Victim |
|---|---|---|---|
| Count 1 | Co-defendant Brown<br>Co-defendant Campbell | Attempted Especially<br>Aggravated Robbery<br>(by violence) | L.P. |
| Count 2 | Co-defendant Brown<br>Co-defendant Campbell | Attempted Especially<br>Aggravated Robbery<br>(by putting in fear) | L.P. |
| Count 3 | Co-defendant Brown<br>Co-defendant Campbell | Attempted<br>Aggravated Robbery<br>(by violence) | Q.T. |
| Count 4 | Co-defendant Brown<br>Co-defendant Campbell | Attempted<br>Aggravated Robbery<br>(by putting in fear) | Q.T. |
| Count 5 | Co-defendant Brown<br>Co-defendant Campbell | Attempted First<br>Degree Murder | Co-defendant<br>Harbison |
| Count 6 | Co-defendant Brown<br>Co-defendant Campbell | Attempted First<br>Degree Murder | Defendant<br>North |
| Count 5 | Co-defendant Brown<br>Co-defendant Campbell | Attempted First<br>Degree Murder | Mr. King |

20

| | | | |
|---|---|---|---|
| Counts 8-10 | Co-defendant Brown<br>Co-defendant Campbell | Employing a firearm during<br>the commission of a dangerous<br>felony | |
| Count 11 | Defendant North<br>Co-defendant Harbison | Attempted First<br>Degree Murder | L.P. |
| Count 12 | Defendant North<br>Co-defendant Harbison | Attempted First<br>Degree Murder | Co-defendant<br>Brown |
| Count 13 | Defendant North<br>Co-defendant Harbison | Attempted First<br>Degree Murder | Co-defendant<br>Campbell |
| Count 14 | Defendant North<br>Co-defendant Harbison | Attempted First<br>Degree Murder | M.W. |
| Counts 15-18 | Defendant North<br>Co-defendant Harbison | Employing a firearm during<br>the commission of a dangerous<br>felony | |

Clearly, pursuant to Rule 8 of the Tennessee Rules of Criminal Procedure, each defendant in this case is not charged with accountability for each offense included. Therefore, these cases are joined on the basis that they were "so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8 (3). This is a case in which a group of men, including the Defendant and co-defendant Harbison who belonged to one gang, saw another group of men, including co-defendants Brown and Campbell who belonged to a rival gang, appearing to rob two high school students. A shoot-out ensued, and L.P. was shot twice as a result. We agree that these offenses occurred in temporal proximity, actually occurring at the same time and the proof of one set of offenses would be difficult to separate from the proof of the other set of offenses.

We are extremely troubled by the fact that the Defendant and co-defendants in this case are both defendants and victims depending on which count in the indictment is being addressed. This practice seems to be one wrought with the potential for Constitutional error. Our standard of review, however, requires that the Defendant on appeal show that he was "clearly prejudiced" in his defense by being jointly tried with his codefendants. *See Howell*, 34 S.W.3d at 491. The Defendant's defense was based upon the theory that co-defendant Brown was robbing L.P. and that he shot into the air to stop the robbery. His defense was further bolstered by co-defendant Harbison's testimony that co-

21

defendants Campbell and Brown were associated with Mr. Lagrone, who had shot at co-defendant Harbison's mother's house and that the men feared co-defendants Campbell and Brown. The Defendant's defense in this regard was not hindered by being tried together with his co-defendants. The Defendant showed that he and co-defendant Harbison pulled up to the scene as co-defendant Brown was acting in a manner that led them to believe he was robbing L.P. The Defendant introduced evidence that co-defendants Brown and Campbell were associated with Mr. Lagrone, who had shot at co-defendant Harbison's mother's house shortly before this incident. The jury heard that the Defendant and co-defendant Harbison feared co-defendants Brown and Campbell and thought they were robbing two students. The Defendant offered evidence that he shot only to stop the robbery.

The only non-testifying co-defendant who the Defendant was unable to cross-examine was co-defendant Campbell. The portion of co-defendant Campbell's statement introduced into evidence included that he traveled to the Austin-East area from "the Ville." He stopped his car and, shortly thereafter, another car pulled up beside him and the occupants started shooting. He said he heard a bunch of gunshots and blacked out. He denied ever having or firing a gun. Co-defendant Campbell made no mention of the identity of the people in the other vehicle, the direction in which they fired, or the type of weapons that they possessed. His statement, as heard by the jury, did not implicate the Defendant.

The Defendant asserts that his trial strategy was undermined because, while he and co-defendant Campbell sought to limit the evidence presented to the jury, co-defendants Brown and Harbison chose to testify and subject themselves to cross-examination. While the Defendant speculates that it is "unlikely that [co-defendant] Brown would have testified at the Defendant's trial if the Defendant's trial had been separate from [co-defendant] Brown's [trial]," the State could have called co-defendant Brown even if the Defendant was not tried with his co-defendants. It is equally possible that the evidence presented in such a scenario would be even more damaging to the Defendant's case.

Accordingly, while we view the denial of severance with concern, we conclude that the Defendant has not proven that he was "clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." He is, therefore, not entitled to relief on this issue. In so holding, we recognize the recently released opinion of this Court in *State v. Lujan Harbison*, No. E2015-00700-CCA-R3-CD, 2016 WL 4414723, at *20 (Tenn. Crim. App., at Knoxville, Aug. 18, 2016), which holds that the trial court's failure to sever these cases constituted reversible error. Based upon the facts and arguments related to this Defendant, Arterious North, we have concluded that he has not proven that he was clearly prejudiced by the trial court's failure to sever.

22

## B. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain his convictions for attempted voluntary manslaughter because the "actual sequence of events is still lacking in sufficient clarity, by the fog of conflicting testimony from the State's own witnesses and lack of sufficient observation and recollection to form a complete picture of the sequence of events and specific roles of the individuals involved." He concedes that the State proved that a shooting happened, that multiple weapons and individuals were involved, and that a bystander was seriously injured, but he asserts that the State did not prove who was trying to kill whom and who fired the shots. The State counters that the evidence is sufficient to sustain all four convictions of attempted voluntary manslaughter: one count against L.P.; one count against co-defendant Campbell; one count against co-defendant Brown; and one count against their passenger, M.W.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.

1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The criminal responsibility for the conduct of another statute, Tennessee Code Annotated section 39-11-402(2), states in relevant part: "A person is criminally responsible for an offense committed by the conduct of another, if: . . . (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"

In *State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013), our Supreme Court explained:

> Criminal responsibility is not a separate crime, but "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility represents a legislative codification of the common law theories of aiding and abetting and accessories before the fact. *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the

defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002).

Accordingly, "defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997)).

Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. T.C.A. § 39-13-211(a). Voluntary manslaughter is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Criminal attempt is defined, in pertinent part, as "[acting] with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

The Defendant was convicted of four counts of attempted voluntary manslaughter for crimes against L.P. and the three occupants of a car at which he shot: co-defendant Brown, co-defendant Campbell, and M.W. The evidence presented at trial, viewed in the light most favorable to the State, proved that co-defendant Campbell drove a car, in which co-defendant Brown and M.W. were passengers, past a group of students multiple times. These men were from west Knoxville and were members of a gang. The students mistakenly flashed a gang sign at the car of men, thinking that they knew the men. Co-defendant Brown got out of the vehicle armed with a weapon, approached the students, identified himself, and inquired about the students' identity. He asked the students to empty their pockets, and the students complied.

Co-defendant Harbison drove a car in which the Defendant, Mr. King, and Mr. Issacs were passengers and passed by this scene. The men had at least three weapons in the car, a .357 pistol, a 9 mm, and a Hi-Point. These men believed that co-defendants Brown and Campbell, who were affiliated with a rival gang, had been involved in the shooting of co-defendant Harbison's mother's house. Seeing the confrontation between co-defendant Brown and L.P., the men began shooting at the rival gang members. The Defendant admitted that he fired his .357 pistol, and co-defendant Harbison said he fired a 9 mm pistol. The Defendant also believed that the men in the backseat, one of whom

had a Hi-Point discharged their weapons. Co-defendant Brown, co-defendant Campbell, and M.W. returned fire.

As a result of this shooting, L.P. was shot in the arm and the stomach. It was unclear who fired the weapon that caused the injury. Police examined the car that co-defendant Campbell drove and found four bullet holes to the outside of the vehicle and two spent bullets inside the vehicle. The Defendant put forth evidence that he fired his gun because he believed that L.P. was being robbed and that he shot into the air to stop the robbery.

This evidence sufficiently establishes that the Defendant engaged in a shoot-out and that, acting in a state of passion produced by adequate provocation, i.e. being shot at after attempting to stop a robbery, led him to shoot back at the car in which the four rival gang members rode. In so doing, while acting in this state of passion, he attempted to kill the occupants therein. This is sufficient evidence to support the jury's verdict of guilt for three counts of attempted voluntary manslaughter against co-defendant Campbell, co-defendant Brown, and M.W.

The Defendant argues that there is no proof as to whose bullet hit L.P. and that he cannot therefore be held criminally responsible for the attempted voluntary manslaughter of L.P. As to this argument, we adopt this Court's reasoning in *Harbison*, 2016 WL 4414723, at *22-24.

> *(1) Count 11—Victim L.P.* [Co-defendant Harbison] submits that the doctrine of transferred intent "cannot be applied to attempted voluntary manslaughter" and, therefore, his conviction in count 11 must be reversed and dismissed. [Co-defendant Harbison] notes his own testimony that he had no intent to harm L.P. and L.P.'s testimony that he knew [co-defendant Harbison], that they were on friendly terms, and that [co-defendant Harbison] had "[n]o reason . . . to try and kill" him. The State responds that "it is irrelevant [whether L.P.] was an intended victim specifically[,]" citing *State v. Samuel Glass*, No. E2012-01699-CCA-R3-CD, 2013 WL 4677654, at *11-12 (Tenn. Crim. App. Aug. 28, 2013), because [co-defendant Harbison] "and his cohorts intended to accomplish a killing," firing multiple shots in L.P.'s direction.
>
> The common law doctrine of transferred intent, which provides that "a defendant who intends to kill a specific victim but instead strikes and kills a bystander is deemed guilty of the offense that would have been committed had the defendant killed the intended victim," has a checkered history in this state. *Millen v. State*, 988 S.W.2d 164, 166-67 (Tenn. 1999) (citations omitted) (recounting history of application of transferred intent

26

doctrine). In *Millen*, our supreme court concluded that "the transferred intent rule has little application under our modern statutory law." 988 S.W.2d at 167. The court observed that "[a] plain reading" of the first degree murder statute "indicates that a defendant's conscious objective need not be to kill a specific victim. Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., 'cause the result.'" *Id.* at 168. The court held that so long as "the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." *Id.* However, the court noted that the "unintended victim" cases are more appropriately prosecuted as felony murder. *Id*. at 167-68.

Similarly, the mens rea of "knowingly" required for second degree murder can also focus on the result. Tennessee Code Annotated section 39-11-302(b) specifically states that a person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. To this end, the Millen court also noted that previous cases have upheld the doctrine's application in second degree murder cases. 988 S.W.2d at 166; *see State v. Harper*, 334 S.W.2d 933 (1960); *State v. Summerall*, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). Additionally, this court has expanded the ruling in *Millen* to convictions for attempted first degree murder, *see, e.g., State v. Fabian Claxton*, No. W2009-01679-CCA-R3-CD, 2011 WL 807459, at *6-7 (Tenn. Crim. App. Mar. 7, 2011), and attempted second degree murder, *see, e.g., Glass*, 2013 WL 4677654, at *11-12; *State v. Tarrence Parham*, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at *11 (Tenn. Crim. App. July 26, 2010); *State v. Horace Demon Pulliam*, No. M2001-00417-CCA-R3-CD, 2002 WL 122928, at *5 (Tenn. Crim. App. Jan. 23, 2002), concluding that the reasoning in *Millen* was equally applicable to those offenses.

However, we agree with [co-defendant Harbison] that these cases deal only with first and second degree murders and any attempts to commit those crimes. *Millen* has not been expanded beyond that in this State. To the contrary, it has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. *See State v. Tilson*, 503 S.W.2d 921 (Tenn. 1974); *State v. Chris Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *11 (Tenn. Crim. App. Mar. 9, 2011); *State v. Antonius Harris*, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim.

27

App. Nov. 7, 2002); *State v. Khristian Love Spann*, No. 1230, 1989 WL 86566, at *7 (Tenn. Crim. App. Aug. 3, 1989); *see also Commonwealth v. LeClair*, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am.Jur.2d Homicide § 53 (2010).

The Tennessee Supreme Court first addressed this issue in *Tilson*, 503 S.W.2d at 921. The defendant in *Tilson* had been involved in a barroom brawl with several men prior to leaving the bar. *Id.* at 922. The defendant returned a short time later with a pistol and shot the victim who had taken no active part in the fight but had been "on the side" of the one provoking the fight. *Id.* at 923-24. Our supreme court held that the defendant's actions did not constitute voluntary manslaughter because he killed an unarmed man who was simply "on the side" of the person who provoked an earlier fight with the defendant. *Id.* Similarly, in a more recent decision, this court held that there was insufficient evidence to support a defendant's claim of adequate provocation when the defendant had kidnapped several people and was shot by one of the victims before he "shot his unarmed victim whom he had been holding at gunpoint and who had done nothing to provoke the defendant." *Harris*, 2002 WL 31654814, at *12-13.

In the present matter, the jury found that [co-defendant Harbison] was adequately provoked by his hostile co-defendants, who had a history of violence towards one another. However, there was no evidence that L.P. provoked [co-defendant Harbison], in fact, all evidence pointed to the contrary. [Co-defendant Harbison] testified that he was trying to protect L.P. from being robbed and had no intent to harm L.P. L.P. said that he was familiar with [co-defendant Harbison], agreed that they "were on friendly terms," and testified that he did not know of any "reason for [co-defendant Harbison] to try to kill [him]." Voluntary manslaughter requires that the act of the slayer be the result of provocation instigated by the person slain. Accordingly, there is insufficient evidence to support the element of adequate provocation.

In addition to the transferred intent doctrine, [co-defendant Harbison] also challenges his criminal responsibility for Count 11 by arguing that the bullet recovered from L.P.'s body was determined to be .45-caliber and, therefore, was not fired by him. However, given the lack of provocation on the part of L.P. towards any of the defendants, the State cannot base this conviction for the attempted manslaughter conviction of L.P. on the other's actions under a theory of criminal responsibility.

28

The evidence supported an inference that the .45-caliber bullet that hit L.P. came from inside the Cobalt [co-defendant Harbison] was driving. Co-defendant North testified that someone in the backseat was carrying a Hi-Point handgun. The firearms examiner said that the class characteristics on the bullet retrieved from L.P. and on the one found inside the Malibu were consistent with having been fired through a Hi-Point firearm. Nonetheless, there is no evidence that L.P. provoked anyone—neither any of the occupants of the Cobalt nor the Malibu. Again, "[a] person is criminally responsible as a party to an offense *if the offense is committed* by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (emphasis added). Here, none of the shooters involved can be guilty of the offense of attempted voluntary manslaughter of L.P., which requires the act of the slayer be the result of provocation instigated by the person slain. There is no credible evidence to suggest that anyone was adequately provoked by L.P. that day. Therefore, there is no offense committed by the conduct of another for which [co-defendant Harbison] can be found guilty. [Co-defendant Harbison's] conviction in count 11 must be reversed the evidence being insufficient to sustain it.

*Harbison*, 2016 WL 4414723, at *22-24. In accordance with this holding, we reverse the Defendant's conviction in this case for the attempted voluntary manslaughter of L.P because the doctrine of transferred intent is inapplicable to such a conviction. Further, his conviction for employing a firearm during the commission of the attempted voluntary manslaughter of L.P. cannot stand. We reverse and dismiss these judgments of conviction.

We note that the Defendant does not challenge the sufficiency of the evidence of his multiple convictions for employing a firearm during the commission of a dangerous felony. Despite this Court's recent holding in *Harbison*, we conclude that this issue does not warrant review in our case. *See Harbison*, 2016 WL 4414723 at *25. We acknowledge the reasoning of that panel that the unit of prosecution of that statute necessitates that only one conviction may stand for each weapon possessed. Our reading of the statute, however, constrains us to conclude that, each time a weapon is "employed" during the commission of a dangerous felony, such employment is an adequate basis for a conviction for employing a firearm during the commission of a dangerous felony. The evidence against the Defendant proves that he "employed" a firearm, specifically by firing a pistol, during the commission of three counts of attempted voluntary manslaughter, a dangerous felony. We would, therefore, conclude that three convictions

for "employing" a firearm during the commission of a dangerous felony does not require proof that the Defendant possessed of multiple firearms but, rather, that the Defendant employed a firearm multiple times, with each time occurring during the commission of a dangerous felony. *See e.g., State v. DeMarco Walters*, No. W2015-01366-CCA-R3-CD, 2016 WL 4250146 (Tenn. Crim. App., at Jackson, Aug. 10, 2016) (affirming sufficiency of evidence when defendant was convicted of four counts of employing a firearm during the commission of a dangerous felony when the defendant entered an apartment and fired at its occupants), *perm. app. denied* (Tenn. Oct. 21, 2016); *State v. Carlos Gonzalez*, No. W2014-02198-CCA-R3-CD, 2015 WL 9171064 (Tenn. Crim. App., at Jackson, Dec. 15, 2015) (affirming sufficiency of the evidence when the defendant was convicted of three counts of employing a firearm during the commission of a dangerous felony when defendant fired a gun into a crowd of people), *perm. app. denied* (Tenn. Apr. 7, 2016); *State v. Corey Antaun Gray*, No. W2015-00049-CCA-R3-CD, 2015 WL 7536105 (Tenn. Crim. App., at Jackson, Nov. 24, 2015) (affirming sufficiency of evidence when the defendant was convicted of four counts of employing a firearm based upon the defendant shooting at a house occupied by multiple victims), *perm. app. denied* (Tenn. Mar. 23, 2016). We do not find that the Defendant's multiple convictions violate due process, and plain error review is unnecessary.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we reverse and dismiss the trial court's judgments of conviction for the attempted voluntary manslaughter of L.P. and for employing a firearm during the commission of the attempted voluntary manslaughter of L.P. We affirm the trial court's judgments in all other respects.

_____
ROBERT W. WEDEMEYER, JUDGE